J-A05008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MARSHALL HALE, | |
| Appellant | No. 2940 EDA 2014 |

Appeal from the PCRA Order of September 17, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0326571-1984

BEFORE: OLSON AND OTT, JJ. and STEVENS, P.J.E.*

MEMORANDUM BY OLSON, J.:                    **FILED SEPTEMBER 23, 2016**

Appellant, Marshall Hale, appeals from the order of September 17, 2014 entered in the Criminal Division of the Court of Common Pleas of Philadelphia County that dismissed as untimely his sixth petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. Upon careful consideration and review, we conclude, contrary to the PCRA court, that the present petition raises genuine issues as to whether Appellant presented viable factual claims that were unknown to him and that could not have been previously ascertained through reasonable diligence. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). Accordingly, we vacate the September 17, 2014 order of the PCRA court dismissing Appellant's present petition without a hearing and remand this matter for further proceedings consistent with this memorandum.

*Former Justice specially assigned to the Superior Court

On November 11, 1983, an unknown man confronted then 14-year old N.A. at gunpoint and forced her into an abandoned house. Once inside, the man forced N.A. to remove her clothing and then orally and vaginally raped her. Upon completion, the attacker used N.A.'s blouse to wipe his penis. A single attacker perpetrated the assault, which lasted approximately one-half hour.

The attack caused N.A. to bleed profusely. After a few minutes, she gathered her clothing, left the abandoned home, and eventually obtained transportation to the hospital from police. At the hospital, N.A. received surgery to repair lacerations on the interior wall of her vagina. In addition, physicians performed a gynecological examination, including a rape kit, on N.A.

On January 2, 1984, Appellant was charged with the attack on N.A. and proceeded to trial in the Court of Common Pleas of Philadelphia County on September 24-26, 1984. At trial, Appellant maintained that he did not commit the attack on N.A. To establish that Appellant perpetrated the assault, the Commonwealth heavily relied on N.A.'s identification testimony. N.A. testified at length regarding each of the occasions on which she either identified or described her attacker.[1] On the date of the incident, N.A. gave

_____

[1] In the intervening years since Appellant's trial, our Supreme Court has authorized the use of expert testimony to challenge eyewitness testimony where the sole evidence to establish guilt was the testimony of a victim who

*(Footnote Continued Next Page)*

a description of the assailant to Philadelphia Police Officer Sonya Coleman while at the hospital. She saw her attacker approaching from across the street, observed him from a close distance during their initial encounter, and saw his face for several minutes during the sexual assault. N.A. described her attacker as approximately 29 years old, small ears and flat nose, height around 5'7" to 5'9", and "chubby" at 190 pounds.

A little over a month later, on December 30, 1983, Officer Coleman went to N.A.'s house and showed her approximately eighteen photographs. N.A. selected a photograph of Appellant from this photo array. Later that same day, N.A. traveled to the Police Administration Building in Philadelphia and reviewed a carousel of slides for approximately one and one-half hours. N.A. picked two slides out of the array, one of which depicted Appellant.[2]

On January 2, 1984, Officer Coleman and another officer returned to N.A.'s house to "put pieces together" of a composite depiction of the attacker. N.A. described her assailant as having a flat nose, small ears, approximately 25 to 30 years of age, and about 5'9" in height. N.A. again reviewed eight photographs and selected one that depicted Appellant.

_(Footnote Continued)_ ─────────────

was under extreme duress when assaulted at gunpoint by a stranger of another race. **_See Commonwealth v. Walker_**, 92 A.3d 766 (Pa. 2014).

[2] On cross-examination, N.A. admitted that she said that one of the slides she picked out was "similar" to Appellant. **_See_** N.T., 9/25/84, at 250. On this occasion, N.A. estimated her attacker to be in his early 20's.

N.A. attended a line up at the Philadelphia detention center on February 15, 1984. Although Appellant was in the sixth position, N.A. failed to identify him. As she left the line up, N.A. told her mother that she believed her attacker was in the sixth position, but she was too upset to identify him since she believed that he could see her. N.A.'s description of her attacker was largely the same as on previous occasions except that she estimated his weight this time to be 165 pounds. N.A. also identified Appellant as her attacker at the preliminary hearing in this matter on March 20, 1984. N.A. expressed some doubts, however, since she was scared.

To link Appellant to the assault against N.A., the Commonwealth also presented the testimony of Maryann Scafidi, a serologist who performed some of the forensic testing in this case. Scafidi testified that N.A. was a virgin at the time of the attack and, therefore, the only individuals who could have contributed to the biological deposits in the rape kit were N.A. and the attacker. Scafidi also explained to the jury that a "secretor" referred to an individual who secretes blood group antigens in all bodily fluids. Scafidi testified that N.A. had blood type O and that she was a secretor. Scafidi reported that Appellant had blood type A. She did not testify as to whether

Appellant was a secretor as the results from the inhibition test[3] performed on Appellant were not known at the time that Scafidi testified.

Scafidi explained for the jury the results of various forensic tests performed on N.A.'s clothing and body. A rape kit performed on N.A. included samples taken from N.A.'s mouth, vagina, vulva, and cervix. In addition, a piece of tissue removed from N.A. during surgery was tested as part of the forensic examination. Scafidi did not personally perform any tests on biological materials recovered from N.A.'s rape kit. Instead, with regard to the results from these tests, Scafidi read to the jury the contents of a laboratory report entitled "MEMORANDUM: Laboratory Report," which was dated December 14, 1983. Section one of this report indicated that the rape kit included samples taken from N.A.'s vagina, vulva, cervix, and mouth. The report stated that N.A.'s vaginal, vulvular, and cervical samples each showed the presence of sperm and acid phosphatase. The vulvular and vaginal samples, however, were inconclusive for blood group substances and the cervical sample showed the presence of H antigens. Neither sperm nor acid phosphatase was detected in the sample drawn from N.A.'s mouth. The

_____

[3] An inhibition or agglutination-inhibition test is a serological technique used to identify unknown antigens in blood and bodily fluids. Mosby's Medical Dictionary, 9th Edition 2009, Elsevier.

report stated that blood group substances were "not applicable" for the oral sample drawn from N.A. The second section of the report stated that N.A. had type O blood and that she was a secretor. The third section of the report remarked that a piece of human tissue of unknown origin was recovered from N.A.'s vaginal sample. No blood group substances were indicated for the tissue and there is no report of the presence of sperm or acid phosphatase on the extracted tissue.[4]

Scafidi personally performed forensic testing on the physical evidence recovered in this case. Scafidi tested N.A.'s blouse, panties, socks, black

_____

[4] Specifically, the document titled "MEMORANDUM: Laboratory Report" and dated December 14, 1983 which was introduced at trial and testified to by Scafidi provided in relevant part as follows:

**LABORATORY SPECIMENS**

| 1. Origin of Sample | Microscopic examination for Sperm | Analysis for Prostatic Acid Phosphatase | Blood Group Substances |
|---|---|---|---|
| Vaginal | POSITIVE | *POSITIVE | INCONCLUSIVE |
| Vulvular | POSITIVE | *POSITIVE | INCONCLUSIVE |
| Cervical | POSITIVE | *POSITIVE | "H" |
| MOUTH | NONE OBSERVED | NOT DETECTED | NOT APPLICABLE |

2.   [N.A.]             is blood group "O" and a secretor.

3.   Other remarks:  A piece of human tissue, of unknown origin, was found in the vaginal sample.

leather shoes, a tweed shirt, and a gray jacket.[5] Blood was found on N.A.'s blouse, underwear, socks, shoes, tweed shirt and gray jacket. The blood detected on N.A.'s blouse and underwear was type B and the blood recovered from N.A.'s socks was type A. Tests on blood recovered from N.A.'s shoes, tweed shirt, and gray jacket were inconclusive. N.A.'s blouse and underwear showed the presence of semen but no identifying features or characteristics were given for the semen deposits recovered from N.A.'s blouse or underwear.

Scafidi testified that an individual with blood type A, such as Appellant, could not have been a contributor to the blood recovered from N.A.'s blouse and underwear, which were stained with blood type B. Since results for the inhibition tests performed on Appellant had not been disclosed prior to Scafidi's testimony, her testimony did not address whether Appellant could have been a contributor to semen deposits found on the rape kit, blouse, and underwear.

In the closing argument, the prosecutor characterized the blood evidence as "confusing" since the results showed the presence of blood type B, while N.A. had type O blood and Appellant had type A. The prosecutor also noted the presence of blood type A on N.A.'s socks. Based on the totality of this blood evidence, the prosecutor reasoned that, since Appellant

_____

[5] A Masonite board recovered from the scene of the attack showed the presence of human blood but no evidentiary material could be recovered.

had blood type A, he was not excluded and he was included in the group of people who could have committed this offense because of the type A blood detected on the victim's socks. The jury found Appellant guilty on September 26, 1984. On April 3, 1985, the court sentenced Appellant to an aggregate term of 23½ to 47 years' incarceration.

Documents produced in 1998 (referred throughout this memorandum as the 1998 production) show that immediately before the conclusion of trial, the Commonwealth completed inhibition studies on Appellant's blood and saliva.[6] These studies showed that Appellant was a secretor and that his inhibition study profile was as follows: A0 B4+ H0.[7] Moreover, the 1998 production included a report on the inhibition studies performed on N.A.'s bodily fluids and rape kit. This report was dated November 11, 1983, the same date as the attack. Even though this report was in the Commonwealth's possession ten months before Appellant's trial, it was not provided to the jury or used to correct or clarify Scafidi's testimony, nor was

---

[6] The report setting forth the results of the studies performed on Appellant's blood and saliva was dated September 26, 1984, the last day of Appellant's trial.

[7] Specifically, the report on Appellant's inhibition study provided, in relevant part, as follows:

Inhibition Studies

| A | B | H |
|---|---|---|
| 0 | 4+ | 0 |

it provided to Appellant until 1998. In contrast with the "MEMORANDUM: Laboratory Report," dated December 14, 1983 which was produced at trial, the inhibition study data for deposits recovered from N.A.'s rape kit showed these profiles: vagina (A3+ B2+ H3+); vulva (A3+ B1+ H1+); cervix (A3+ B3+ H1+(weak)); mouth (A3+ B3+ H0); tissue (A3+ B3+ H4+). N.A.'s inhibition test profile showed as A3+ B3+ H0.[8]

The record reflects that, in the aftermath of Appellant's conviction, the evidence generated in this case was confiscated by the trial court and likely subjected to physical destruction. Documents attached to Appellant's petition state that a blood-stained piece of Masonite board, a vial of hair and

---

[8] Specifically, the November 11, 1983 report on the studies performed on N.A.'s bodily fluids and rape kit provided, in relevant part, as follows:

Inhibition Studies [on N.A.'s saliva]

| A | B | H |
|---|---|---|
| 3+ | 3+ | 0 |

Inhibition Studies [on rape kit]

| | A | B | H |
|---|---|---|---|
| Vagina | 3+ | 2+ | 3+ |
| Vulva | 3+ | 1+ | 1+ |
| Cervix | 3+ | 3+ | 1+[weak] |
| Mouth | 3+ | 3+ | 0 |
| Tissue | 3+ | 3+ | 4+ |

red material, two additional vials of red material, and a footprint recovered from the crime scene were confiscated by the trial court and destroyed pursuant to court order on February 9, 1993. The court also ordered the destruction of N.A.'s rape kit on May 17, 1989. In addition, N.A.'s socks, skirt, jacket, shoes, blouse, and panties were confiscated by the court on September 27, 1984.[9]

In the years following trial, Appellant undertook extensive efforts to challenge his conviction and sentence in both state and federal court, as we shall detail. Appellant filed a direct appeal on April 19, 1985, raising the effectiveness of counsel and objecting to the discretionary aspects of his sentence. On June 18, 1987, this Court affirmed and our Supreme Court denied further review on January 27, 1988. *Commonwealth v. Hale*, 531 A.2d 32 (Pa. Super. 1987), *appeal denied*, 538 A.2d 497 (Pa. 1988).

Appellant filed his first collateral relief petition under the Post-Conviction Hearing Act (PCHA), 42 Pa.C.S.A. §§ 9541, *et seq*. (superseded), on April 5, 1988. The PCHA court appointed counsel who filed an amended petition alleging that trial counsel was ineffective in failing to challenge blood evidence and the expertise of the Commonwealth's serologist, Scafidi. The PCHA court dismissed Appellant's petition on April 1, 1991. This Court affirmed the dismissal order on August 19, 1992 and our

---

[9] It is not clear from the certified record as to whether these items of clothing seized on September 27, 1984 were destroyed.

Supreme Court denied *allocator* on December 29, 1992. ***Commonwealth v. Hale***, 617 A.2d 389 (Pa. Super. 1992), *appeal denied*, 621 A.2d 578 (Pa. 1992).

Appellant filed his second petition under the PCRA on October 7, 1993. Appellant alleged in this petition that he was innocent and that he was entitled to DNA testing under ***Commonwealth v. Brison,*** 618 A.2d 420 (Pa. super. 1992). In response, the Commonwealth represented that the evidence no longer existed. The PCRA court denied this petition on June 2, 1995. This Court affirmed the dismissal order on September 16, 1996 and our Supreme Court denied *allocator* on February 20, 1997. ***Commonwealth v. Hale***, 686 A.2d 1363 (Pa. Super. 1996), *appeal denied*, 690 A.2d 1161 (Pa. 1997).

Next, Appellant filed a *habeas corpus* petition in the United States District Court for the Eastern District of Pennsylvania on February 17, 1998. On July 8, 1998, while this petition was pending, the Commonwealth produced 25 pages of laboratory reports reflecting tests conducted on physical evidence relating to the instant offenses (the 1998 production). This material was unaccompanied by a summary or explanation interpreting the data. The 1998 production included the results of inhibition studies as we have described above. The *habeas* court denied Appellant's request for counsel and an expert to interpret the scientific data. In addition, on August 12, 1998, the court denied the petition without prejudice for failure to exhaust state remedies. In a motion to reconsider dismissal of the *habeas*

petition, Appellant argued that forensic evidence would demonstrate his innocence but that without the assistance of counsel or experts he lacked the capacity to demonstrate how the laboratory results showed his innocence.

On September 10, 1998, Appellant filed his third petition for PCRA relief, claiming that the Commonwealth continued to withhold unspecified exculpatory evidence. The PCRA court dismissed this petition as untimely and this Court dismissed the ensuing appeal on January 9, 2001 for failure to file a brief.

Appellant filed his fourth PCRA petition, *pro se*, on July 9, 2001. In this petition, Appellant attempted to reinstate his appeal from the previous dismissal of his prior petition for collateral relief. The PCRA court denied this petition as untimely and meritless on November 26, 2001 and this Court affirmed that determination on May 6, 2003.

Appellant filed a second *pro se* petition for *habeas corpus* relief on May 19, 2003 in the United States District Court for the Eastern District of Pennsylvania. The court denied this petition on November 25, 2003, concluding that the claim was time-barred and that Appellant displayed a lack of due diligence in failing to amend his original *habeas* petition.

Appellant filed his fifth PCRA petition on April 14, 2006. Relying on **Commonwealth v. Collins**, 888 A.2d 564 (Pa. 2005), Appellant argued that his petition was timely under the newly-discovered constitutional right exception set forth at 42 Pa.C.S.A. § 9545(b)(1)(iii). In addition, Appellant

invoked the newly-discovered fact timeliness exception under 42 Pa.C.S.A. § 9545(b)(1)(ii) based on his contention that the 1998 production of laboratory materials demonstrated the Commonwealth's suppression of exculpatory evidence at trial within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963). The PCRA court held that the petition was untimely on November 30, 2006. On November 15, 2007, this Court affirmed the dismissal of the petition, concluding that it was time-barred because of Appellant's failure to file it within 60 days of when the claims first could have been made as required by 42 Pa.C.S.A. § 9545(b)(2).

On December 21, 2007, Appellant filed a third *habeas corpus* petition, *pro se*, before the United States District Court for the Eastern District of Pennsylvania. The petition alleged that Appellant's trial counsel had been ineffective. The court denied the petition on January 29, 2008 on grounds that it was untimely and, therefore, the court lacked jurisdiction to entertain it.

On March 31, 2009, Appellant filed his sixth PCRA petition, *pro se*, alleging corruption within the Philadelphia Police Department and the use of false evidence to support convictions by the Special Victims Unit in other cases. While this petition was pending, Appellant forwarded a letter to the Pennsylvania Innocence Project (PIP) in May 2009. After reviewing information relating to Appellant's case, and seeking to determine whether additional evidence was available for DNA testing, PIP agreed to represent Appellant on a *pro bono* basis on May 7, 2010. PIP forwarded Appellant's

case materials, including items disclosed in the 1998 production, to Lawrence Presley, a former director of forensic sciences at Arcadia University and the former Chief of the Federal Bureau of Investigation's DNA Analysis Unit. Based upon his review, Presley determined on May 13, 2010 that the inhibition studies performed by the Commonwealth on November 11, 1983 and at the end of Appellant's trial on September 26, 1984, but not disclosed until 1998, excluded Appellant as a potential contributor to the deposits recovered from N.A.'s rape kit. On the strength of this observation, PIP, on Appellant's behalf, filed an amended petition on July 2, 2010 arguing that Appellant was entitled to collateral relief. In addition, the amended petition invoked the timeliness exception set forth at 42 Pa.C.S.A. § 9545(b)(1)(ii), claiming that Presley's conclusions constituted newly-discovered facts that were unknown to Appellant and that could not have previously been discovered despite due diligence. In support of this contention, Appellant asserted that an incarcerated and unrepresented individual such as himself, who lacked scientific training, was incapable of deciphering the raw data produced to him by the Commonwealth in 1998. Additionally, Appellant maintained that efforts he undertook to secure legal representation and expert assistance in the wake of the 1998 production demonstrated reasonable diligence in the protection of his interests. Appellant also alleged that his filing of the amended petition within 60 days of learning of Presley's conclusions satisfied the requirements of 42 Pa.C.S.A. § 9545(b)(2).

Appellant also included a claim seeking DNA testing of any remaining evidence in his case that could be recovered.

As alternate grounds for overcoming the PCRA's timeliness requirement, Appellant invoked the governmental interference exception found at 42 Pa.C.S.A. § 9545(b)(1)(i). The underlying premise of Appellant's governmental interference claim is that the Commonwealth violated his rights under **Brady** in suppressing the laboratory reports contained in the 1998 production. In conjunction with this claim, Appellant asserts that the Commonwealth owed him a duty to provide him with either assistance or explanatory guidance to aide in his comprehension of the 1998 production. Paralleling his **Brady** claim, Appellant asserted that the Commonwealth acted in violation of **Giglio v. United States**, 405 U.S. 150 (1972) when it failed to take steps to correct Scafidi's allegedly misleading testimony upon its completion of inhibition studies involving Appellant's blood shortly before the conclusion of trial on September 26, 1984.

Appellant relied on Presley's conclusions to substantiate his claims that he was entitled to collateral relief based upon previously unknown facts that were wrongfully withheld from him by government officials. Presley's report indicated that the 1998 production included raw data indicating that Appellant had type A blood and that he secreted antigens corresponding to his blood type in all of his bodily fluids. This inhibition study was performed after Scafidi testified for the Commonwealth but before the jury found

Appellant guilty. The results of the inhibition study were not presented to the jury before it found Appellant guilty.

Presley also made several observations interpreting the raw data set forth in the 1998 production. Specifically, Presley noted that the September 26, 1984 inhibition test performed on Appellant showed the following results: A0 B4+ H0. The November 11, 1983 inhibition study performed on the deposits recovered from N.A.'s rape kit showed these profiles: vagina (A3+ B2+ H3+); vulva (A3+ B1+ H1+); cervix (A3+ B3+ H1+(weak)); mouth (A3+ B3+ H0); tissue (A3+ B3+ H4+).[10] N.A.'s inhibition study profile showed as A3+ B3+ H0. Presley noted that the inhibition study profiles for both N.A. and Appellant showed that they are H0, meaning that neither of them expressed the H antigen on their red blood cells. In addition, since both N.A. and Appellant were secretors (meaning that antigens corresponding to their respective blood types appears in all their bodily fluids), the H antigen would not be present in a sample mixture in which they were the exclusive contributors. Presley further noted the undisputed testimony in the case that established that N.A. had no prior sexual partners and that there was only a single perpetrator in the rape. Based upon these factors, in combination with the fact that inhibition studies

_____

[10] The term "inconclusive" which is used in the "MEMORANDUM: Laboratory Report" dated December 14, 1983 to which Scafidi testified at Appellant's trial does not appear in the raw data contained in the 1998 production.

performed on swabs from N.A.'s rape kit showed the presence of H antigens in all three locations, Presley concluded that Appellant could not have raped the victim. Presley communicated his findings to PIP on or around May 13, 2010 and summarized his observations in a letter included with Appellant's amended petition, which was filed on July 2, 2010.

Appellant's petition spelled out the steps he took to secure assistance in presenting his claims following the 1998 production. In 1999, Appellant sent letters to the Innocence Project in New York and Centurion Ministries in New Jersey. Neither organization offered assistance after learning that physical evidence in the case was no longer available for testing. Following trial, Appellant also asked other groups for help, including the National Association for the Advancement of Colored People (NAACP) Legal Defense Fund, Inc., the National Association of Criminal Defense Lawyers, Volunteers in Prison, the National Legal Aide & Defender Association, Attorney General Janet Reno, the Allegheny County Bar Association, the Erie County Bar Association, Legal Services, Inc., and Keystone Legal Services. Many of these organizations declined assistance on grounds that they do not offer *pro bono* services or because they received information that the evidence in this case no longer existed.

The Commonwealth filed its answer to Appellant's sixth petition on September 17, 2012. In its answer, the Commonwealth maintained that Appellant's petition was unreviewable because his claims were previously litigated. Specifically, the Commonwealth argued that Appellant's third,

fourth, and fifth PCRA petitions raised claims identical to those advanced in the present submission. The Commonwealth also asserted that Presley's conclusions merely reinterpreted earlier data and did not constitute newly-discovered facts. Lastly, the Commonwealth criticized the validity of Presley's report as embracing a faulty premise that did not establish Appellant's innocence.

Contrary to Presley's report, the Commonwealth claimed that both N.A. and Appellant expressed the H antigen in their blood. Citing the "MEMORANDUM: Laboratory Report," dated December 14, 1983 and introduced through Scafidi at trial, the Commonwealth alleged that inhibition studies conducted on material recovered from N.A.'s rape kit were inconclusive "except for the blood typing results from the seminal fluid recovered from N.A.'s cervix and vulva, which contained H antigens, corresponding to N.A.'s 'O' blood type."[11] Commonwealth's Answer, 9/12/12, at 11. The Commonwealth also alleged that Appellant wrongly maintained that the semen on N.A.'s blouse and panties indicated type B blood. The Commonwealth asserted that only **blood evidence** recovered from the victim's clothing was found to be type B, not the seminal fluid. The

_____

[11] This is contrary to Scafidi's testimony at trial (N.T., 9/26/84, at 386-388) and the "MEMORANDUM: Laboratory Report" dated December 14, 1983 which establish that blood type testing for N.A.'s cervical sample was inconclusive.

Commonwealth explained that as there was no evidence that the rapist bled during the attack, the analysis of blood detected on N.A.'s clothing was irrelevant.[12] *Id.* at 12.

The Commonwealth also cited several reasons to reject Appellant's governmental interference claim. First, the Commonwealth averred that Appellant failed to plead and prove that the actions of a government official interfered with the presentation of his claims. In particular, the Commonwealth pointed out that Appellant's inability to retain an expert who was willing, prior to the instant petition, to interpret the raw data in the 1998 production in a way that was favorable to him was not the fault of state agents. Moreover, the Commonwealth argued that Appellant's *Brady* claim was fundamentally flawed since: (1) the information on which he now relies was, in fact, produced; (2) the evidence was inconclusive and not exculpatory; and, (3) Appellant was not prejudiced since the jury received testimony that he could not have contributed to the blood on the victim's clothing.

On August 11, 2014, the PCRA court forwarded Appellant a notice, pursuant to Pa.R.Crim.P. 907, of the court's intent to dismiss Appellant's

---

[12] The Commonwealth added that Scafidi informed the jury that blood found on N.A.'s blouse and panties was type B and, as such, could not have come from Appellant or N.A. The Commonwealth noted, in this connection, that the blood evidence was unreliable, and thus could not form the basis of relief, since the victim's blood did not show up on her own panties.

petition without a hearing. Appellant did not respond to the Rule 907 notice. Thereafter, on September 17, 2014, the PCRA court issued an order dismissing Appellant's petition as untimely.

The PCRA court initially addressed Appellant's effort to invoke the governmental interference exception. Here, the court determined that Appellant failed to show that government officials prevented him from reaching out to experts to interpret the data included in the 1998 production. Accordingly, the court concluded that Appellant failed to file the instant petition within 60 days from which the claim could first have been presented. The court also determined that the laboratory results included in the 1998 production merely confirmed Scafidi's trial testimony in which she said that neither Appellant's nor N.A.'s blood was found on the victim's blouse or panties and, therefore, the test results were inconclusive. Appellant thus failed to show prejudice since there was no reason to believe that the trial would have concluded differently if the laboratory results had been released to the defense.

Turning to Appellant's newly-discovered facts claim, the PCRA court made several findings of fact disputing the statements set forth in Presley's report. The court rejected Presley's conclusions to the extent he found that neither Appellant nor N.A. expressed the H antigen on their red blood cells. Without citation to authority, the court deemed these assessments as

"contradicted by the generally accepted principles of serological testing." PCRA Court Opinion, 1/30/15, at 11.[13] Moreover, and again without citation to the record or scientific authority, the court specifically found "that [Appellant's] serological testing indicated that [he] did in fact possess H antigens in his blood." *Id.* The court therefore concluded that the presence of H antigens in the samples recovered from N.A.'s rape kit corroborated Appellant's conviction.

In addition, the court rejected the contention that Presley's report contained newly-discovered facts that supported an exception to the PCRA's time-bar. Because of this, the court reasoned that Appellant needed to file his petition within 60 days of the 1998 production if he believed that the raw data exonerated him. The court viewed Appellant's present claim as the subject of several prior petitions and therefore deemed Presley as a newly willing source of proof for purely cumulative claims. Having rejected, without attribution, Presley's claims regarding the source of deposits obtained from N.A.'s rape kit, the court argued that Appellant used Presley's report to advance a claim that he could not be guilty because type B blood was found on the victim's clothing and neither Appellant nor N.A. had type B blood. Consequently, the court dismissed Appellant's petition as untimely.

---

[13] The certified record does not contain any evidence as to the generally accepted principles of serological testing applicable to this case; therefore, we are not sure what the PCRA court relied upon in reaching this conclusion.

Appellant filed a timely notice of appeal. The trial court did not order the submission of a concise statement under Pa.R.A.P. 1925(b).

On appeal, Appellant raises the following claims:

Did the PCRA court err in holding, without an evidentiary hearing under Pa.R.Crim.P. 908, that [Appellant's] petition was untimely where there was evidence that [Appellant's] status as a Type A [s]ecretor which shows: (a) that the semen found on the victim and on her clothing did not come from him and (b) was not previously known or understood by [Appellant], was a newly-discovered fact pursuant to 42 Pa.C.S.A. § 9545(b)(1)(ii)?

Did the PCRA court err in holding, without an evidentiary hearing under Pa.R.Crim.P. 908, that [Appellant's] petition was untimely where there was evidence that any delay establishing untimeliness was a result of government interference pursuant to 42 Pa.C.S.A. § 9545(b)(1)(i) because the Commonwealth withheld exculpatory test showing that [Appellant] is a Type A [s]ecretor and thus the semen found on the victim and her clothing did not come from him, in violation of **_Brady_**?

Is [Appellant] eligible for relief under 42 Pa.C.S.A. § 9543(a)(2)(i) because the Commonwealth withheld exculpatory evidence, lab tests showing that [Appellant] is a Type A [s]ecretor, and thus the semen found on the victim and her clothing did not come from him, in violation of **_Brady_** and **_Giglio_**?

Is [Appellant] eligible for relief under 42 Pa.C.S.A. § 9543(a)(2)(vi) because of the unavailability at the time of trial of exculpatory blood evidence that [Appellant] is a Type A [s]ecretor which shows that the semen found on the victim and her clothing did not come from him, which, if presented to the jury, there would have been a reasonable probability of a different result?

Did the PCRA court err in dismissing [Appellant's] petition without an evidentiary hearing under Pa.R.Crim.P. 908 where material issues of fact existed as to (a) whether the Commonwealth complied with the [PCRA c]ourt's March 28, 2013 [o]rder directing the Commonwealth to conduct an

- 22 -

evidentiary search "in order to permit DNA and additional blood serum testing of all physical evidence;" and (b) whether physical evidence may exist for testing as provided by 42 Pa.C.S.A. § 9543,1?

Appellant's Brief at 2-4.

Before we begin our discussion, we address certain matters pertaining to the scope of our review. In his third and fourth claims, Appellant alleges that he is entitled to collateral relief because the Commonwealth violated his constitutional rights and because exculpatory evidence that would have altered the outcome of his trial has subsequently become available. In our discretion, we shall defer ruling on these claims. The trial court dismissed the instant petition, without a hearing, as untimely and Appellant appealed that ruling. It is thus premature for this Court to weigh in at this stage of the proceedings on issues that were not reached by the PCRA court and for which no evidentiary record has been developed. Given the obvious complexity of the serological evidence in this matter, we cannot abandon our role as a reviewing court and take on matters as a court of first instance. Accordingly, we shall confine our discussion to the issues of timeliness and Appellant's request for confirmation regarding the availability of evidence for forensic testing.

We begin with Appellant's contention that the PCRA court erred in concluding, without a hearing, that he failed to demonstrate that his petition advanced a claim based on newly-discovered facts under 42 Pa.C.S.A. § 9545(b)(1)(ii). Based on Presley's report, Appellant claims that he learned

for the first time in May 2010 that he was a type A secretor and that the raw data included within the 1998 production excluded him as a possible contributor to the deposits recovered from N.A.'s rape kit and that therefore he is excluded as the rapist. Appellant maintains that these facts were unknown to him prior to that time and that this information was unknowable to him despite the exercise of due diligence.

Our standard of review in this case is well-settled. This Court will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. *Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012). We grant deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. *Commonwealth v. Carter*, 21 A.3d 680, 682 (Pa. Super. 2011). However, we afford no such deference to its legal conclusions. *Commonwealth v. Paddy*, 15 A.3d 431, 442 (Pa. 2011). Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary. *Commonwealth v. Colavita*, 993 A.2d 874, 886 (Pa. 2010). Moreover, pursuant to Pa.R.Crim.P. 908, the PCRA court shall schedule a hearing whenever a petition, together with the Commonwealth's answer, raise material issues of fact. Pa.R.Crim.P. 908.

To succeed in pleading and proving a timeliness exception under § 9545(b)(1)(ii),[14] Appellant must demonstrate that "the facts upon which [his] claim is predicated were unknown to [him] and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S.A. § 9545(b)(1)(ii). "Due diligence demands that the petitioner take reasonable steps to protect his own interests. A petitioner must explain why he could not have learned of the new fact(s) earlier with the exercise of due diligence." ***Commonwealth v. Williams***, 35 A.3d 44, 53 (Pa. Super. 2011) (citations omitted) (emphasis added), *appeal denied*, 50 A.3d 121 (Pa. 2012).

_____

[14] Because Appellant's petition is manifestly untimely, it is subject to dismissal unless Appellant pleads and proves one of the following three statutory exceptions:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S.A. § 9545(b)(1)(i)-(iii). Additionally, any petition invoking an exception provided in 42 Pa.C.S. § 9545(b)(1) must be filed within 60 days of the date that the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2).

Moreover, a petitioner seeking to invoke an exception set forth in 42 Pa.C.S.A. § 9545(b)(1) must file his petition within 60 days of the date that the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2). "[T]he 60–day rule requires a petitioner to plead and prove that the information on which he relies could not have been obtained earlier, despite the exercise of due diligence." *Commonwealth v. Williams*, 105 A.3d 1234, 1239-1240 (Pa. 2014).

Based upon careful examination of the parties' submissions before this Court and the PCRA court, the opinion issued by the PCRA court, and the certified record, we conclude that Appellant raises genuine issues of fact as to whether the facts set forth in Presley's report were unknown to him before May 2010. We reach this conclusion in view of the totality of circumstances, including the sophisticated scientific nature of the analysis employed by Presley in developing his report, Appellant's status as an incarcerated and unrepresented individual who lacks scientific training and experience, and the vast difference between the present claim and Appellant's prior generic requests for collateral relief. We further conclude, in light of Appellant's efforts to obtain both representation and a scientific interpretation of the raw data contained in the 1998 production, that Appellant raises genuine issues as to whether the instant claims were unknowable to him before May 2010 despite the exercise of reasonable

diligence. Accordingly, we shall vacate the PCRA court's dismissal order and remand this matter for a hearing. We summarize our reasons below.

At the outset, we note a glaring legal error in the PCRA court's assessment of Appellant's newly-discovered facts claim. In the section of its opinion addressing exceptions to the PCRA's time-bar, the court set forth the legal test for examining whether a petitioner is entitled to collateral relief based upon after-acquired evidence pursuant to 42 Pa.C.S.A. § 9543(a)(2)(vi), rather than applying the standard used to determine whether the timeliness exception for newly-discovered facts has been met. *See* PCRA Court Opinion, 1/30/15, at 8. Our Supreme Court has held that the newly-discovered facts exception does not require a court to analyze the after-discovered evidence rule. ***Commonwealth v. Bennet***, 930 A.2d 1264, 1270 (Pa. 2007); ***Commonwealth v. Brown***, 111 A.3d 171, 179 (Pa. Super. 2015) (new facts exception set forth at § 9545(b)(1)(ii) does not require merits analysis of underlying after-discovered-evidence claim). Although this legal error alone would justify vacating the court's dismissal order, we do not end our discussion here so that we might address other claims and issues discussed by the PCRA court and the Commonwealth in order to lend guidance to the proceedings on remand.

With respect to the factual basis for Appellant's claims, both the PCRA court and the Commonwealth disputed Presley's assessment that neither N.A. nor Appellant expressed the H antigen on their red blood cells and, by

extension, in their other bodily secretions, as both are secretors. ***See*** Commonwealth's Motion to Dismiss Appellant's Amended PCRA Petition and Request for Post-Conviction DNA Testing, 9/17/12, at 11 ("both N.A. [sic] and [Appellant's] blood contain H antigens"); PCRA Court Opinion, 1/30/15, at 11 (suggesting that Presley's conclusion that neither N.A. nor Appellant expressed H antigens on their red blood cells is "without scientific basis and [is] directly contradicted by the generally accepted principles of serological testing"). Neither the court nor the Commonwealth, however, cited an evidentiary or authoritative source in support of their respective positions. Although the Commonwealth's expert, Michael P. Garvey, Jr., disputed Presley's conclusions regarding the presence of H antigens in N.A.'s and Appellant's blood, he did not do so in absolute terms, leaving room for the conclusions set forth in Presley's report.[15] Moreover, no hearing was

---

[15] In his report, Garvey stated as follows:

> In section 5, [Presley] incorrectly states that "The victim's blood does not contain H antigens, and neither does [Appellant's]." The inhibition studies for both the complainant and [Appellant] indicate the presence of H antigens. As the H antigen is the precursor protein for all ABO blood groups, it is expected to be found in a Type O individual, and not uncommon to be found in the remaining types of ABO groups. [Presley's] further conclusions about the presence of H antigens and the source of the stains are not supported by the analyses.

Expert Report of Michael P. Garvey, Jr., 6/29/11, at 6-7 ¶ 5e. Garvey's report states that H antigens are "expected to be found in" individuals with type O blood and that such antigens are "not uncommon" in other blood

*(Footnote Continued Next Page)*

conducted in this case to establish the relevant scientific principles governing this dispute and to evaluate the respective expert opinions through conventional means. The proper way to resolve this conflict in the parties' factual contentions is to conduct a hearing in which the experts are subjected to examination.[16] We cannot overemphasize the importance of

_(Footnote Continued)_ _____

groups. As such, Garvey does not foreclose the inferences and conclusions drawn by Presley. This classic battle between the expert for the Commonwealth and the expert for Appellant should have been resolved by convening a hearing, placing the witnesses under oath, and subjecting them to cross-examination. It is not the PCRA court's prerogative to credit one witness and reject another based on the reports submitted in support of the parties' pleadings.

[16] Throughout its submissions in defense of the PCRA court's ruling, the Commonwealth repeatedly credits its own expert and criticizes the report filed on behalf of Appellant. These efforts are confusing at best, misleading at worst, and only serve to illustrate the need for a hearing at which the parties can air their disputed positions. For example, the Commonwealth complains that Appellant misrepresents the report prepared by the Commonwealth's expert, noting that the portions of the report referenced by Appellant were based on "inconclusive" data that could not be used to identify the source of semen recovered from N.A.'s rape kit. **See** Commonwealth's Brief at 14 n.3. However, the term "inconclusive" appears only in the document titled "MEMORANDUM: Laboratory Report," dated December 14, 1983, which was introduced at trial. That term is not used in the raw data included in the 1998 production on which Presley relies. In addition, even if the various lab reports in this case cannot be used to identify the source of a particular semen deposit, it is at least conceivable that they can be used to exclude Appellant, which is the theme of Presley's report.

The Commonwealth takes this same tact again at footnote 5 on page 16 of its brief where it asserts that supposedly new facts regarding Appellant's semen are irrelevant since, according to the testimony introduced at trial in 1984, N.A.'s clothes contained a mixture of blood and an indeterminate quantity of semen. Again, this assertion overlooks the fact that the raw data
_(Footnote Continued Next Page)_

resolving this disputed issue at a hearing, as Presley's conclusion regarding the absence of the H antigen in both Appellant and N.A. laid the foundation for his overall conclusion that Appellant could not be a contributor to the semen deposits recovered from N.A.'s rape kit based upon the inhibition study profiles included in the 1998 production. On remand, the PCRA court should allow a thorough vetting of the disputed scientific principles and findings advanced by the parties.

The inclination to resolve this complex matter on the parties' submissions has spilled over onto other aspects of this dispute. Both the PCRA court and the Commonwealth argue that Appellant's current request for collateral relief is unreviewable because it raises claims that were the subject of litigation in prior petitions. They therefore assert that Presley serves only as a newly willing source of advancing arguments previously resolved on multiple past occasions. **See** Commonwealth's Motion to Dismiss Appellant's Amended PCRA Petition and Request for Post-Conviction DNA Testing, 9/17/12, at 9-11 ("[Presley's report] is simply an interpretation of the same facts already known from the laboratory data" and merely raises

_(Footnote Continued)_ ────────────

found in the 1998 production contained a very specific profile for the material recovered from N.A.'s rape kit, which Presley used to draw his conclusions. For these critical components of his opinion, Presley did not rely on the inconclusive rape kit testimony introduced at trial, the inconclusive test results found in the "MEMORANDUM: Laboratory Report" of December 14, 1983, or the blood evidence that Scafidi communicated to the jury.

issues addressed in Appellant's third, fourth, and fifth petitions); PCRA Court Opinion, 1/30/15, at 12 ("the report prepared by Presley merely serves as a newly willing source to advance an argument already litigated multiple times, including at trial").

Strictly speaking, whether a similar claim or similar relief is requested in a prior petition is not the focus of the newly-discovered facts exception to the time-bar. To invoke § 9545(b)(1)(ii) properly, the petitioner need only plead and prove that the basis for the claim was unknown to him and could not have been discovered despite reasonable diligence. 42 Pa.C.S.A. § 9545(b)(1)(ii). While there is obvious overlap since a claim will be "known" if it has been previously litigated, courts must use caution to focus on the precise factual or legal basis of the current claim and not to link claims merely because they seek the same type of relief or challenge the same type of evidence. Under the PCRA, jurisdictional rules are strictly enforced and its provisions bar re-litigation of the same claims; however, the statute imposes no upward limit on the number and ways a petitioner might seek relief, so long as the jurisdictional requirements are met and the present claim involves distinct factual or legal components. For example, a petitioner may assert a claim that he is innocent because his blood type was not recovered from the evidence. If he loses, he is not precluded from asserting a later claim alleging that his DNA is not a match, even though both claims assert his innocence and challenge blood or biological evidence

recovered from the crime scene. In the present petition, Appellant relies upon a scientific assessment of serological reports that were produced to him in 1998, long after trial. This is not the same thing as his prior generic claims alleging that there exists unspecified evidence that exonerates him.

This problem of overgeneralization appears to have led the PCRA court astray. The PCRA court here argued that, "[Appellant] used [Presley's] report to advance the argument that because [type B] blood was found at the scene, and neither [Appellant] nor N.A. had [type B] blood, then he cannot be guilty." PCRA Court Opinion, 1/30/15, at 12. Although Appellant litigated this claim at trial and asserted it in prior collateral proceedings, it is not the basis of the instant petition. Appellant's present claims allege that based upon his inhibition study profile, together with inhibition studies performed on N.A. and the samples recovered from her rape kit (as reflected in the 1998 production), he cannot be a contributor to the semen recovered from N.A.'s body and therefore did not commit the rape. It may be the case, as Garvey's report suggests, that the studies performed on Appellant, N.A., and the rape kit are not reliable to support the inferences drawn by Presley or that Presley's claims conflict with accepted serological principles, but this is not a decision that can be made based only on the parties' submissions and without a hearing. We have reviewed the prior submissions filed by Appellant in the context of his third, fourth, and fifth petitions and it is clear that the present petition raises factual contentions far different from

those previously raised.[17]   Accordingly, Appellant's past petitions are not grounds for refusing to consider whether the factual assertions made by Presley were unknown to Appellant before May 2010 and, if so, whether Appellant could have made those factual assertions prior to that time through the exercise of due diligence.

We are not persuaded by the arguments offered by the PCRA court and the Commonwealth to establish that Appellant failed to raise genuine issues as to whether he exercised due diligence in bringing the instant claim. We begin with the Commonwealth's contention that Appellant failed to explain why he did not learn his blood type, secretor status, and inhibition study profile before trial since it was obvious at that time that forensic serology would be an important component of this case.   **See** Commonwealth Brief at 14-15 ("[Appellant] was entitled to test his bodily

_____

[17] In its brief, the Commonwealth quotes a portion from our 2007 memorandum decision in which we rejected an appeal challenging the denial of Appellant's fifth petition.  **See** Commonwealth Brief at 17.  The quoted language refers to our rejection of a claim in which Appellant alleged that the Commonwealth suppressed exculpatory evidence contained in the 1998 production in violation of **Brady**.  That ruling had nothing to do with the factual and legal questions currently raised by Appellant's petition in which he asserts that a scientific interpretation of the raw data found in the 1998 production presents newly-discovered facts that were unknown to him before May 2010 and previously unknowable despite the exercise of reasonable diligence.  For this reason, the Commonwealth's attempt to block review under the law of the case doctrine fails.  **See Commonwealth v. Starr**, 664 A.2d 1326, 1331-1332 (Pa. 1995) (law of the case applies only to decisions on same issue and exception to rule applies where there is a change in the evidence).

fluids before, during, or after trial. He did not do so, even though . . . it was obvious that the forensic results would be an integral aspect of his defense."). Doubling down on this assertion, the Commonwealth contends that: "If testing [Appellant's] bodily fluids would prove his innocence, then due diligence required him to seek that testing prior to trial."[18] *Id*. at 16. Frankly, we are puzzled as to why the Commonwealth makes this assertion since its own brief undercuts the contention. In fact, the Commonwealth recognizes:

> The reason prior counsel did not hasten to ascertain whether [Appellant's] semen contains antigens is, of course, **because it is irrelevant**. Of the three sperm-containing samples recovered from N.A.'s rape kit, antigen testing was inconclusive for two of them and the third contained H antigens common to all blood types.

Commonwealth Brief at 16 n.5 (emphasis added), *citing* N.T., 9/24/84, 387-388).

We wholly agree with the Commonwealth's refutation of its own position regarding Appellant's exercise of due diligence prior to trial. The factual posture of this case at that time showed only that blood type test

---

[18] It appears that the Commonwealth is conflating the burden of proof required at the time of trial and the burden of proof necessary to establish due diligence for purposes of the newly-discovered facts exception to the timeliness requirement under the PCRA. Although a petitioner has the burden to establish due diligence for purposes of the PCRA, we remind the Commonwealth that the burden at trial is on the Commonwealth to prove a defendant's guilt, not on the defendant to prove his innocence. Thus, contrary to the Commonwealth's statement, Appellant had no obligation to "prove his innocence" such that he should have sought testing prior to trial.

results on materials recovered from N.A.'s rape kit were inconclusive. It was not until the production of raw data in 1998 that detailed information became available. At the time of trial, counsel for Appellant had no reason to have his client tested since there was no base line data available for comparison. Arguably, then, the Commonwealth's own concession suggests a plausible, if not compelling, argument that the Commonwealth's actions led Appellant to relax his vigilance and forgo forensic blood testing prior to trial.

The issue of Appellant's due diligence in the wake of the 1998 production presents a more complicated question. Both the PCRA court and the Commonwealth assert that Appellant had both the means and obligation to file his claim within 60 days of the 1998 production. *See* PCRA Court Opinion, 1/30/15, at 11 ("If [Appellant] believed that the [test] results [in the 1998 production] might have exonerated him, he should have filed a PCRA petition within 60 days of receiving them."); Commonwealth Brief at 15. We conclude, under the circumstances in this case, that Appellant raised genuine issues of fact as to his employment of due diligence.

At first blush, it seems easy to conclude that an 11- or 12-year delay in filing a petition easily defeats a claim under § 9545(b)(1)(ii) and (2). As we stated above, however, due diligence requires only that a petitioner exercise due diligence in the protection of his interests. Although in 1998 Appellant received the raw data on which his claim now relies, it is not at all

clear that he possessed at that time the capacity to formulate the particular claim now before us. The petition avers, without dispute, that Appellant was incarcerated and unrepresented from 1998 until 2010. In addition, the petition alleges that Appellant lacks training and experience in serology and forensic sciences. During the period from 1998 until 2010, Appellant took several steps to secure representation and expert assistance in understanding the information produced to him, including a letter writing campaign to various agencies and the filing of multiple requests for collateral relief. We conclude, in view of these circumstances, that Appellant has raised genuine issues as to whether he exercised due diligence in the pursuit of his legal interests, as advanced in the present petition. On remand, the PCRA court should inquire into what skill, training and experience it took to raise the particular claim leveled in the instant petition, whether Appellant possessed such talents, and (if not) whether Appellant's efforts demonstrated due diligence in securing assistance with the preparation of his claim.

In sum, we conclude that Appellant raises genuine issues of fact as to whether the facts set forth in Presley's report were unknown to him before May 2010. We further conclude, in light of Appellant's efforts to obtain both representation and a scientific interpretation of the raw data contained in the 1998 production, that Appellant raises genuine issues as to whether the instant claims were unknowable to him before May 2010 despite the exercise

of reasonable diligence. Accordingly, we vacate the PCRA court's dismissal order and remand this matter for a hearing on the issue of whether appellant properly invoked the exception to the PCRA's timeliness requirement under 9545(1)(ii).[19] In addition, the PCRA court on remand shall direct the Commonwealth to certify in writing what evidence remains available for DNA testing. For all items that are no longer available, the Commonwealth shall certify in writing what efforts were undertaken to locate the evidence.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/23/2016

---

[19] In the context of his governmental interference claim under 42 Pa.C.S.A. § 9545(b)(1)(i), Appellant argues that the Commonwealth withheld exculpatory information and, upon its subsequent production, failed to furnish the means by which the raw scientific data could be deciphered. He also asserts that the Commonwealth failed to clarify misleading testimony introduced to the jury by Scafidi. In light of our resolution of Appellant's newly-discovered facts claim, we need not address Appellant's claim under § 9545(b)(1)(i).